## In re MULTIDISTRICT VEHICLE AIR POLLUTION.

### M.D.L. Docket No. 31.

United States District Court,
C. D. California.

Nov. 21, 1973.

Office of the Attorney General, State of Ohio, Columbus, Ohio, Alan Witten, William J. Scott, Atty. Gen., State of Ill., Antitrust Div., Chicago, Ill., Robert F. Coleman, Asst. Atty. Gen., Jerome H. Torshen, Chicago, Ill., Louis J. Lefkowitz, Atty. Gen., Anti-Monopolies Bureau, New York City, John M. Desiderio, Asst. Atty. Gen., Schwartz & Alshuler, Los Angeles, Cal., Marshall Crossman, C. Jon Handy, Santa Monica, Cal., William R. Bernstein, Los Angeles, Cal., Perry Goldberg, Chicago, Ill., Dilworth, Paxson, Kalish, Levy & Coleman, Philadelphia, Pa., Edward F. Mannino, Philadelphia, Pa., Richard H. Borow, Irell & Manella, Los Angeles, Cal., Robert W. Warren, Atty. Gen., Harold J. Lessner, Asst. Atty. Gen., Madison, Wis., William J. A. Sturtz, Long Beach, Cal., Norman Redlich, Corp. Counsel, New York City, David I. Shapiro, Washington, D. C., Sidney P. Howell, Jr., Rogers, Hoge & Hills, New York City, David Berger, Philadelphia, Pa., H. Laddie Montague, Jr., William H. Kuretsky, Deputy Atty. Gen., St. Paul, Minn., Fredric C. Tausend, David G. Knibb, Seattle, Wash., William L.

Dwyer, John S. Ebel, Culp, Dwyer, Guterson & Grader, Seattle, Wash., Paul C. Duncan, Asst. Atty. Gen., Chief, Civ. Div., State of Oklahoma, Oklahoma City, Okl., The Commonwealth of Puerto Rico, San Juan, Puerto Rico, Francisco de Jesus Schuck, Atty. Gen., Vern Miller, Atty. Gen., Topeka, Kan., William H. Ward, Asst. Atty. Gen., Glenn Warner, Karpf, Leibow & Warner, Beverly Hills, Cal., Gerry J. Elman, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., Carl W. Divelbiss, Divelbiss & Gage, Phoenix, Ariz., Anthony C. Joseph, Asst. Atty. Gen., Los Angeles, Cal., and Cooper & Scarpulla, Josef D. Cooper, San Francisco, Cal., for plaintiffs.

O'Melveny & Myers, Warren M. Christopher, Allyn O. Kreps, George A. Manfredi, Los Angeles, Cal., Cross, Wrock, Miller & Vieson, J. Herbst, Detroit, Mich., Forrest A. Hainline, Jr., Gen. Counsel and Vice President American Motors Corp., Detroit, Mich., Gibson, Dunn & Crutcher, Julian O. von Kalinowski, Marsha K. McLean, Charles C. Ivie, Frederick R. Wirtz, Los Angeles, Cal., Wilmer, Cutler & Pickering, Lloyd N. Cutler, Louis F. Oberdorfer, Robert P. Stranahan, Jr., James S. Campbell, Washington, D. C., Pacht, Ross, Warne, Bernhard & Sears, Harvey M. Grossman, Los Angeles, Cal., McCutchen, Black, Verleger & Shea, Philip K. Verleger, Max K. Jamison, Jack D. Fudge, David A. Destino, Los Angeles, Cal., Paul A. Heinen, Chrysler Corp., Detroit, Mich., Ziegler, Dykhouse, Wise & Huth, William E. Huth, Detroit, Mich., Overton, Lyman & Prince, Carl J. Schuck, George Christensen, Frederick A. Clark, Los Angeles, Cal., Roger W. Barrett, Robert L. Stern, Erwin C. Heininger, Robert F. Finke, Mayer, Brown & Platt, Chicago, Ill., Wright Tisdale, James M. MacNee, III, Ford Motor Co., Dearborn, Mich., Lawler, Felix & Hall, Marcus Mattson, R. F. Outcault, Jr., William E. Prachar, F. John Nyhan, Los Angeles, Cal., Kirkland & Ellis, Hammond E. Chaffetz, George D. Newton, Jr., John H. Morrison, Chicago, Ill., Ross L. Malone, Robert A. Nitschke, Burton L. An-

sell, General Motors Corp., Detroit, Mich., Latham & Watkins, Alan N. Halkett, David V. Lee, Los Angeles, Cal., Donald S. Bowie, Mack Trucks, Inc., Allentown, Pa., Munger, Tolles, Hills & Rickershauser, Carla A. Hills, Los Angeles, Cal., Covington & Burling, John H. Schafer, III, E. Edward Bruce, Washington, D. C., and George V. Brown, Edward F. Green, White Motor Corp., Cleveland, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

REAL, District Judge.

This matter is now before the Court upon remand from the Court of Appeals for the Ninth Circuit in In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122 (1973), (hereafter *MDL 31*). Pursuant to Rule 16 of the Federal Rules of Civil Procedure, the Court undertakes to fulfill the admonition of the appellate court after its rejection of plaintiffs' damage claims to resolve what is a fundamental issue of this litigation in its present posture.

The court in *MDL 31, supra*, leaves to this Court the resolution of the availability of equitable relief with this caveat:

> "We emphasize that we now intimate no conclusions as to either the merits of the equitable claims or the availability of any form of injunctive relief. These issues must, in the first instance, be resolved by the District Court." Id. at 131.

Since resolution of these issues can affect all CCS and class action plaintiffs,[1] they have been given notice by liaison counsel affording them the opportunity to supplement the authorities presented by plaintiffs State of California and State of Washington, and to request a hearing upon any matters which they felt might not have been adequately covered by these plaintiffs and which affect the position of all CCS and class action plaintiffs vis-a-vis the availability of equitable relief.

Plaintiffs have asked for equitable relief primarily by way of requiring defendants, at their own expense, to retrofit[2] automobiles which defendants have manufactured and sold to the public without effective air pollution control devices.

Plaintiffs ground their claim of right to equitable relief in the antitrust laws of the United States as articulated in section 16 of the Clayton Act [15 U.S.C. § 26] which provides in its pertinent part:

> "§ 26. Injunctive relief for private parties; exception
>
> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . ., against threatened loss or damage by a violation of the antitrust laws . . ., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . .."

The statutory language, without the benefit of judicial interpretation[3] clearly permits private parties[4] to obtain an injunction against "threatened loss or damage" caused by an antitrust violation. Defendants would have the Court limit its equitable powers under section 16 simply to remedy the *"threatened conduct"* of the defendants which has,

---

1. CCS plaintiffs are those city, county and state plaintiffs requesting equitable relief generally by way of retrofit.

2. Retrofit is the installation of presently available air pollution control devices upon all automobiles not presently so equipped from the factory. It also includes updating certain automobile air pollution control devices to present day technological advances in the air pollution field.

3. It is not suggested that judicial interpretation is absent. Case law clearly supports the conclusions drawn here.

4. Section 16 of the Clayton Act [15 U.S.C. § 26] was enacted to put private persons in parity with the United States in obtaining injunctive relief in antitrust cases. See 51 Cong.Rec. 14214–14215 (1914).

concededly, been effectively proscribed by the consent decree in United States v. Automobile Mfrs. Assn., 307 F.Supp. 617 (C.D.Cal.1969), aff'd per curiam sub nom., New York v. United States, 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970).[5]

■ Yet, the Supreme Court has also made clear that affirmative acts may be required of defendants whenever necessary, not only to proscribe future conduct but also "to redress the antitrust violation proved", United States v. du Pont & Co., 366 U.S. 316, 323, 81 S.Ct. 1243, 1248, 6 L.Ed.2d 318, 323 (1961); "to undo what could have been prevented . . . ". Schine Theatres v. United States, 334 U.S. 110, 128, 68 S.Ct. 947, 957, 92 L.Ed. 1245, 1258 (1948); or to "cure the ill effects of the illegal conduct", United States v. United States Gypsum, 340 U.S. 76, 88, 71 S.Ct. 160, 169, 95 L.Ed. 89, 100 (1950); reiterated in United States v. Glaxo Group Ltd., 410 U.S. 52, 64, 93 S.Ct. 861, 35 L.Ed.2d 104, 113 (1973). Reading the language of the statute and applying the rationale of the decided cases, two conclusions are inescapable: 1. "threatened" as it modifies both "loss or damage" and "conduct" encompasses not only the future as it relates to the adjudication of liability to assure free competition, but also *continuing* "loss or damage" which may have been caused by "conduct" already terminated; and 2. that this Court may exercise the full panoply of its traditional equitable powers to remedy all otherwise irreparable "loss or damage" that a plaintiff properly before the Court can prove.[6] Equitable relief, either in its traditional concepts of prevention of continuing irreparable harm or in its antitrust application, "is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing claims.' . . .

[The] availability [of equitable relief] should be 'conditioned by the necessities of the public interest which Congress has sought to protect' ". Zenith Radio Corporation v. Hazeltine Research Inc., 395 U.S. 100, 131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129, 152 (1968).

■ Defendants, though not denying the Court's power to grant equitable relief to correct antitrust violations, do strongly urge that the exercise of a Court's equitable powers in antitrust cases is limited to the maintenance or restoration of competition. Plaintiffs, on the other hand, looking for the broadest relief possible once a violation has occurred, would have the Court look to all possible tort remedies to cure the effects of what they describe as the "continuing injury caused by their [the defendants] unlawful conspiracy". However, what the Court must do, in exercising the full panoply of its equitable powers, is to act in "the public interest which Congress has sought to protect" (Zenith Radio Corporation v. Hazeltine Research Inc., *supra*) by its enactment of the antitrust laws.

■ This Court has recognized that a party may "be given the benefit of employing 'any available remedy to make good the wrong done.' " In re Multidistrict Private Civil Treble Damage Antitrust Litigation Involving Motor Vehicle Air Pollution Control Equipment No. 31 (C.D.Cal.1970), 52 F.R.D. 398, 399. The recognition of such a principle of justice, as compelling as it might appear, does not permit this Court to disregard the purpose and intent of Congress in the enactment of specific remedies for the violation of specific, statutorily created, rights. If the plaintiffs have any equitable relief available to them, the Court must, at this juncture in the litigation, find an antitrust application to the established contentions of the parties. This process

---

5. "Concededly" because plaintiffs in argument stated "they [the defendants] are now competing like crazy".

6. Although defendants disagree with the opinion of the Court of Appeals in *MDL 31*, *supra*, plaintiffs were given "standing" to seek equitable relief.

requires a review, and a determination of the permissible parameters of the protections afforded by the antitrust laws. Thus, the broad mandate to courts that relief shall be granted "under the same conditions and principles as injunctive relief against threatened conduct . . . is granted by courts of equity, under the rules governing such proceedings, . . ." does not permit a court, for instance, to redress an intentional tort or a nuisance under the auspices of a plaintiff seeking entry into a Federal courtroom through the guise of an antitrust violation not related to the purpose of the enactment of any of the antitrust laws of the United States.

■ Plaintiffs' contentions are that the cross-licensing agreement of 1955[7] *and* other, somewhat undefined, acts of delay in the development of automobile air pollution control devices,[8] together make up the claimed violation of the antitrust laws. Yet, among the issues that plaintiffs concede are not concerned in this lawsuit are: 1. the proof of any specific delay *in the development* of air pollution control devices; and 2. the proof of any conspiracy[9] affecting the development of automobile air pollution

control devices by third party manufacturers, *i. e.*, there exists no conspiracy to prevent others from freely engaging in the business of manufacturing or marketing automobile air pollution control devices. With these exclusions in mind, we can, for the purpose of determining the availability of equitable relief, assume that there was some agreement to delay the installation of known and/or readily producible air pollution control devices on automobiles manufactured by defendants.

With these concessions, plaintiffs would then have this Court decide the *availability* of equitable relief with merely an antiseptic "yes" or "no". In other words, plaintiffs contend that the pleadings and the Court of Appeals' giving them *standing* are dispositive of the issue of the availability of the remedy. Contrary to plaintiffs' urging, however, the decision of the Court of Appeals in *MDL 31, supra*, neither suggests nor compels such a disposition of this important litigation. The decision leaves this Court free to address the totality of the issue now, in the light of largely completed discovery and of the comprehensive factual contentions of all the parties before the Court. Although, plaintiffs

---

7. Pertinent to plaintiffs' claims are the following provisions of the agreement dated July 1, 1955, and signed by all defendants:
 "Article V—Exchange of Technical Data and Other Information
 Each of the parties hereto further agrees to exchange through its authorized representative of the remaining parties hereto all technical data and other information pertaining to said Licensed Devices. Such exchange of technical data and other information shall be conducted under the direction of the Vehicle Combustion Products Subcommittee of the Engineering Advisory Committee of the Automobile Manufacturers Association."
 Through the Engineering Advisory Committee operating pursuant to this agreement, defendants agreed to withhold publication of development data and to withhold offering for public use developed devices for air pollution control except with the concurrence of all the parties.
 The cross licensing agreement itself creates no illegality under the antitrust laws.

Standard Oil Company (Indiana) v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926 (1930); Cutter Laboratories, Inc. v. Lyophile-Cryochem Corp., 179 F.2d 80 (9th Cir. 1949).

8. For instance plaintiffs contend that defendants delayed installation of positive crankcase ventilation systems (PCV) from at least the start of the 1960 model year until the 1961 model year in California and the 1963 model year nation wide or that defendants delayed installation of closed crankcase controls from at least the start of the 1961 model year until January 1, 1964 in California and until the 1968 model year nation wide. There are, in addition, other contentions of delay, none of which differ substantially from those set forth here. Plaintiffs' Contentions of Fact—Threatened Injury.

9. Limited solely to the cases of CCS and class action plaintiffs.

and defendants differ as to the interpretation they would have this Court draw from a reading of the many documents upon which each rely, these disputes do not affect the consideration of the availability of equitable relief.

Antitrust laws, since their first enactment in July 1890, have been considered a charter of Economic Liberty aimed at preserving free and unfettered competition—no more and no less. They are not intended—nor do they purport to be—a panacea to cure all the ills that befall our citizenry by the accident that some damage or injury may have been caused by a business enterprise.

Nonetheless, plaintiffs claim that defendants' conduct is violative of the antitrust laws because defendants were delaying the development of effective automobile air pollution control devices, and that this delay has caused, and is continuing to cause, injury to the plaintiffs. Hence, what plaintiffs say they want is:

"... a decree which will stop a continuing injury to the air and which will restore their air quality as much as possible and as soon as possible to the state of purity it would have been *but for* defendants' acts." (Memorandum of Plaintiffs on Equitable Relief p. 3.)

What, then, this case really involves is the abatement of a nuisance created by a purported antitrust conspiracy. We must, therefore, analyze what plaintiffs ask for in the way of relief in light of what is now apparent they propose to prove.

Smog is the product of the internal combustion engine; and, appropriate to our discussion, its cause is the widespread use of the automobiles manufactured and marketed by the defendants. That smog is bothersome and that every effort must be made to eradicate it need no documentation here. It is sufficient, for our purposes only, to recognize that the Odyssey of vehicle air pollution control really begins with the realization that the automobiles manufactured by defendants are the source of a substantial amount, if not all, of our current smog problems. In response to the discovery in the early 1950s that the automobile was the culprit, and to mounting pressures from the public, the defendants—somewhat reluctantly—undertook to alleviate the public pressures by conduct that occasionally bordered on the leger-demain.

A cooperative program [10] to attempt to find the root causes of automobile air pollution and to develop some control that would reduce or eliminate the automobile as a source of air pollution was inaugurated with the execution of a so-called "cross-licensing agreement" dating back to 1955. "Cooperation," as contemplated by the cross-licensing agreement, not only provided for the exchange of technical data but also prevented any defendant from releasing information relating to, or from announcing the use of, any developed control device without the concurrence of the other defendants.

It is the defendants' claim that, absent this cooperative effort, it is impossible to envision the frustrations and failures that may have been visited upon their individual efforts to eliminate the causes and effects of automobile air pollution. Yet each defendant, in its own way, claims major contributions to the development of air pollution control devices now being used in contemporary automobiles. All of these claims notwithstanding, the cooperative efforts of the defendants were less than spectacular; [11] and often the cross-licens-

---

10. "Cooperative" would appear euphemistic in light of the agreed evidence of defendant Chrysler's insistence upon its theory of air pollution control by engine modification rather than by device.

11. Giving some credence to the theory that only when government undertakes to put some profit motive into the solution of our scientific problems, will industry undertake any enthusiastic and really successful effort within any reasonable period of time. See, *e. g.*, our space program.

ing agreement was used to advance the selfish aims of some of the individual defendants.[12] Consequently, we must now consider whether these actions, taken both cooperatively and individually, are violative of the antitrust laws of the United States.

Plaintiffs contend that the conduct of defendants is violative of the antitrust laws and urge upon the Court, in support of their requested relief, the language of Mr. Justice Holmes in Georgia v. Tennessee Copper Co., 206 U.S. 230, 237–238, 27 S.Ct. 618, 51 L.Ed. 1038, 1045 (1907), that "It is a fair and reasonable demand on the part of a sovereign that the air over its territory should not be polluted . . . ." But, Georgia v. Tennessee Copper Co., *supra*, does not really come to the aid of the plaintiffs. A reading of the case leaves only the conclusion that it is the law of nuisance [not antitrust] that dictated the availability and scope of legal and/or equitable relief that could be given plaintiff, State of Georgia, in its parens patriae claim for injunctive relief to secure the private and public interests of its citizens which had been invaded by defendant Tennessee Copper. To make more of the case is simply unwarranted, either by analogy or by its unequivocal language.

■ Moreover, defendants here are automobile manufacturers[13] competing during the period significant to plaintiffs' claims in the manufacture of automobiles for sale to the American public. No claim is made by plaintiffs that any combination or conspiracy in violation of the antitrust laws occurred in connection with this aspect of defendants' business. It is as a result of this competition and the monumental use of the smog producing internal combustion engine, that substantial discomfort and sometimes actual illness have been suffered by uncountable millions of Americans. This conduct is the sole and proximate cause of smog.[14] It may, of course, amount to the creation of and maintenance of, and/or causing the maintenance of a public nuisance; but this nuisance is not the result of any conspiracy or combination in restraint of trade. It is, if anything, the consequence of the free marketing of a smog producing product. Is this, then, an evil the cure to which is found in section 16 of the Clayton Act [15 U.S.C. § 26]? Defendants' conspiracy, as now defined by plaintiffs, is one addressed not to the marketplace, but rather to joint tort feasors refusing, or delaying in, the abatement of an existing and continuing public nuisance. Assuming, without deciding, that such a conspiracy (*i. e.*, maintaining a nuisance) is unlawful, the redress for such unlawful conduct, is not found in the antitrust laws. Plaintiffs, however viewed, would attempt to squeeze a nuisance body into an antitrust form; but the form has no legislative or judicial capacity to accept it.

■ Recognizing the difficulties inherent in their claim, plaintiffs invite the Court to depart from the traditional application of the antitrust laws to find a solution to this most perplexing social problem. No Court faced with the opportunity to perform such a public service could resist the temptation to be innovative despite the skillful attempts of defendants to dissuade it from such a course with the virtually Orwellian threats of mechanical impossibility. Courts are—like Tevya[15]—concerned with tradition. The right to sue either for damages or equitable relief for antitrust violations is not court created;

---

12. See footnote 8, *supra*.

13. It is insignificant to this conclusion that defendant Motor Vehicle Manufacturers Association (MVMA) does not manufacture or market automobiles.

14. This statement is made recognizing that the automobile, though a very substantial contributor is not the only source of smog.

15. Fiddler on the Roof.

and in light of this fact, it is incumbent upon courts to limit relief in antitrust cases to the "necessities of the public interest *which Congress has sought to protect*". Zenith Radio Corporation v. Hazeltine Research Inc., *supra*. [Emphasis ours.]

 The 80 year history of the antitrust litigation discloses that courts have, without exception, related equitable relief in antitrust cases to the restoration of, or maintenance of, competitive conditions in the marketplace. The only purpose of the antitrust laws was —and is—the guarantee of a free marketplace in which an unsophisticated consumer can be assured of the best possible product for the least possible expense.

Mr. Justice Frankfurter has observed that "wisdom too often never comes, and so one ought not to reject it merely because it comes late." [16] Yet, departure from "tradition" can only be justified when innovation is the product of wisdom. Certainly, in the battle against smog the hour is late, and the invitation to provide an innovative solution to it is tempting—and most flattering; but unfortunately the wisdom has not yet come.

Plaintiffs have made many other suggestions for possible equitable relief. These include, for instance, requiring the defendants to establish a program for testing automobile emissions and for measuring ambient air quality; establishing computerized systems for increasing traffic flow and speed; assisting in the establishment of improved and expanded mass transportation services, and other programs, all of which go beyond any power of this Court to grant, even if one presumes the defendants' liability for the acts complained of in plaintiffs' instant litigation.

The decision of this Court upon the issue of law which defines the scope of the Court's equitable power in antitrust cases affects all the cases in *M.D.L. Docket No. 31* in which equitable relief is sought by CCS or class action plaintiffs. Dismissals, therefore, shall be entered in the following cases:

Marshall B. Grossman, et al. v. Automobile Manufacturers Association, Inc., et al., No. 69–1855–R;

The State of California, et al. v. Automobile Manufacturers Association, Inc., et al., No. 70–541–R;

State of Wisconsin v. General Motors Corporation, et al., No. 70–806–R;

City of Philadelphia v. Automobile Manufacturers Association, Inc., et al., No. 70–846–R;

County of Lackawanna, Pennsylvania, et al. v. Automobile Manufacturers Association, Inc., No. 70–858–R;

Thomas E. Keane, et al. v. General Motors Corporation, et al., No. 70–1039–R;

State of New Mexico v. American Motors Corporation, et al., No. 70–1040–R;

State of New Jersey v. American Motors Corporation, et al., No. 70–1041–R;

The State of Illinois v. Automobile Manufacturers Association, Inc., et al., No. 70–1042–R;

State of Connecticut v. American Motors Corporation, et al., No. 70–1043–R;

City and County of Denver v. American Motors Corporation, et al., No. 70–1044–R;

The State of New York v. Automobile Manufacturers Association, Inc., et al., No. 70–1137–R;

The City of New York, et al. v. Automobile Manufacturers Association, Inc., et al., No. 70–1477–R;

The State of Minnesota v. Automobile Manufacturers Association, Inc., et al., No. 70–2107–R;

State of Washington, et al. v. General Motors Corporation, et al., No. 71–611–R;

16. Henslee v. Union Planters National Bank & Trust Company, 335 U.S. 595, 609, 69 S.Ct. 290, 293, 93 L.Ed. 259, 264 (1948).

The Commonwealth of Virginia v. Automobile Manufacturers Association, Inc., et al., No. 71–805–R;

The State of Missouri v. Automobile Manufacturers Association, Inc., et al., No. 71–806–R;

The State of Iowa v. Automobile Manufacturers Association, Inc., et al., No. 71–807–R;

The State of Ohio v. Automobile Manufacturers Association, Inc., et al., No. 71–958–R;

State of Kansas v. General Motors Corp. et al., No. 71–959–R;

State of Vermont v. Automobile Manufacturers Association, Inc., et al., No. 71–960–R;

Commonwealth of Pennsylvania v. Automobile Manufacturers Association, Inc., et al., No. 71–961–R;

The State of Rhode Island v. Automobile Manufacturers Association, Inc., et al., No. 71–962–R;

State of Texas v. Automobile Manufacturers Association, Inc., et al., No. 71–1019–R;

State of Florida v. Automobile Manufacturers Association, Inc., et al., No. 71–1020–R;

State of Louisiana v. Automobile Manufacturers Association, Inc., et al., No. 71–1021–R;

State of Mississippi v. Automobile Manufacturers Association, Inc., et al., No. 71–1022–R;

Commonwealth of Kentucky v. Automobile Manufacturers Association, Inc., et al., No. 71–1023–R;

State of Alabama v. Automobile Manufacturers Association, Inc., et al., No. 71–1024–R;

The Commonwealth of Massachusetts v. Automobile Manufacturers Association, Inc., et al., No. 71–1025–R;

State of South Dakota v. General Motors Corporation, et al., No. 71–1026–R;

State of Oklahoma v. Automobile Manufacturers Association, Inc., et al., No. 71–1027–R;

The State of Arizona v. Automobile Manufacturers Association, Inc., et al., No. 71–1224–R;

Commonwealth of Puerto Rico v. Automobile Manufacturers Association, Inc., et al., No. 71–1565–R.