**The STATE OF TEXAS, Plaintiff-Appellant,**

v.

**Reuben PANKEY, Jim Brown, Marcus Burks, W. F. Martin, Frank Sauble, T. L. Roach, Carl Hennegan and Dewey Gann, Defendants-Appellees.**

**No. 353–70.**

United States Court of Appeals, Tenth Circuit.

Feb. 8, 1971.

Rehearing Denied March 8, 1971.

Second Rehearing Denied May 10, 1971.

Crawford C. Martin, Atty. Gen. of Tex., and Nola White, Alfred Walker, Vince Taylor, Roland Allen, Sally Phillips, Malcolm Smith, Richard W. Chote, Roger B. Tyler, Asst. Attys. Gen., filed brief for plaintiff-appellant.

Modrall, Seymour, Sperling, Roehl & Harris, and James E. Sperling and John R. Cooney, Albuquerque, N. M., filed brief for defendants-appellees.

Before LEWIS, Chief Judge, and PHILLIPS and JOHNSEN*, Circuit Judges.

JOHNSEN, Circuit Judge.

The appeal is from the dismissal, for lack of jurisdiction, of a suit for an injunction, instituted by the State of Texas in the District Court for the District of New Mexico, against some citizens of the State of New Mexico. We think the court erred in its holding, and we reverse.

Eight owners or operators of ranch lands within the watershed of the Canadian River in New Mexico were named as defendants, and all other New Mexico ranchers within the watershed were attempted to be included with them on a class basis. The complaint sought to have the defendants enjoined from using Toxaphene, a chlorinated camphene pesticide, as spray upon their lands for eradicating range caterpillars. Any such

* Of the Eighth Circuit, sitting by designation.

application of this chemical, it was alleged, would for a year's time through rainfall carriage, occasion harmful pollution to the water and aquatic life of the Canadian River and improper impairment of Texas' right to natural utilization and enjoyment thereof, in the flow of that stream from New Mexico into Texas. In particular, it was charged that the chemical would cause the water of Lake Meredith, as part of the Canadian River system in Texas, to become unuseable as the source of water supply for eleven Texas municipalities.

The questions presented here are (1) whether the jurisdiction conferred on the district courts by 28 U.S.C. § 1331(a) [derived from the Act of March 3, 1875, 18 Stat. 470], over actions wherein the matter in controversy arises under the Constitution or laws of the United States, has application to actions involving such a matter when the suit is one instituted by a State; and (2) if § 1331(a) does have application in such a party situation, whether the rights which the State of Texas sought to have protected are matters arising under the Constitution or laws of the United States in such sense or on such basis as to be within the signification of that term in its use in the statutory section.

Section 1331(a) Provides:

"The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States."

The first question above is, we think, clearly answered against appellees' contention here, by Ames v. Kansas, 111 U.S. 449, 470–472, 4 S.Ct. 437, 28 L.Ed. 482 (1884). There, the State of Kansas had instituted some suits in one of its own courts against a number of corporations, and the defendants had removed the cases under the Act of 1875 to the Circuit Court of the United States for the District of Kansas because of federal rights being involved. Kansas contended that, even though federal rights were involved, the Act of 1875 did not and could not give jurisdiction to the Circuit (now District) Courts of any such action in which a State was a party, because of the provision of Art. III, Sec. 2 of the Constitution that "In all Cases * * * in which a State shall be Party, the Supreme Court shall have original Jurisdiction".

The Supreme Court rejected the contention on the ground that the original jurisdiction vested in it as to all cases in which a State was a party had not, either by the Constitution or by a statute, been made exclusive. It went on to say (111 U.S. at 470, 4 S.Ct. at 447.):

"The only question we have to consider is, therefore, whether suits cognizable in the courts of the United States on account of the nature of the controversy, and which need not be brought originally in the supreme court, may now [by virtue of the Act of 1875] be brought in or removed to the circuit courts without regard to the character of the parties".

It held that the jurisdiction granted by the statute to the Circuit Courts was not required to be given qualification on the basis of the parties involved, but that the scope of the statute was "without regard to the character of the parties".

This holding and construction of the Act of 1875 does not appear to have been since departed from in any way. The holding would inherently have application as much to controversies involving federal rights between a State and citizens of another state as to controversies of that nature between a State and its own citizens (which was the situation in the *Ames* case). Also, the holding necessarily would carry the implication that there would be no force in an argument, if attempted to be made, that a purported granting of concurrent jurisdiction to a lower federal court, as to any matter or aspect of which the Supreme Court has been given original (but not exclusive) jurisdiction, should be regarded as not being intended to be

made unless the statute contains an express specification of the particular matter or aspect [here, "in which a State shall be Party"] as to which such a concurrent authority is desired to be extended.

██ The State of Texas thus, if federal rights within the purview of § 1331 (a) were here involved, had the options in the present situation of instituting a suit in the State courts of New Mexico or in the Federal District Court for the District of New Mexico, or of seeking leave from the United States Supreme Court to file an original action there.

Its reason for not going into the State courts of New Mexico was perhaps the traditional concept, given expression in Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 289, 8 S.Ct. 1370, 1373, 32 L.Ed. 239 (1888):

> "The object of vesting in the courts of the United States jurisdiction of suits by one State against the citizens of another was to enable such controversies to be determined by a national tribunal, and thereby to avoid the partiality, or suspicion of partiality, which might exist if the plaintiff state were compelled to resort to the courts of the state of which the defendants were citizens".

Its reason, however, for choosing to file suit in the Federal District Court for the District of New Mexico, if a federal right within the purview of § 1331 (a) was involved, instead of seeking to get the Supreme Court to exercise its original jurisdiction in the situation, is a matter of no moment or concern here. Offhand, it might perhaps seem that a State ordinarily would, as a matter of its stature and dignity, choose to request the Supreme Court to accept original jurisdiction of any suit which it desired to institute, the same as to a federal right claim as to any other. Further it seems to us that the Supreme Court has not in the past—perhaps because of its deference for the stature and dignity of the State—engaged in making any distinction between federal right claims and justiciable claims of other nature in relation to permitting a State to file an original suit before it. Such at least is the impression we gain from cases such as Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907) and Wisconsin v. Pelican Ins. Co., 127 U.S. 265, 8 S.Ct. 1370, (1888) (viewing the latter on its basic full-faith and credit question.)

But if a State elects instead to go into a Federal district court to institute a suit on a matter which is within the purview of § 1331(a), as Texas asserts is the situation here, Ames v. Kansas, supra, leaves no room to deny it that right because it may seem singular that it does not attempt to resort to the more prestigious channel—and possibly the more singular when there is a direct precedent for the filing of such an original action as to the particular type of situation, which there is here from the case of Georgia v. Tennessee Copper Co., supra, (discharge of noxious gases into Georgia by some Tennessee copper plants). Rather, we would think that Texas' willingness to have the matter determined by a lower federal court, notwithstanding the precedential situation for an original action, ought to be commended as an appropriate regard by it for not unnecessarily increasing the present burdens of the Supreme Court.

Consideration, however, remains to be made in relation to all this of the second question noted above—whether the rights which the State of Texas sought to have protected are matters arising under the Constitution or laws in such sense or on such basis as to be within the signification of that term in § 1331 (a).

The phrase "arising under", etc., has never come to have an absolute signification or unvarying scope either in its use generally or in relation to § 1331(a). Two aspects are therefore necessary to be dealt with as to the present situation: (1) Is the right of a State to be protected, as asserted by Texas here, from an improper impairment of its natural conditions of environment and resources,

by acts done outside its boundary and so not subject to local reach or control by it, a matter which at all arises under the Constitution or laws of the United States? (2) If Texas' claim can be properly regarded as so arising on some basis, is that basis such as to constitute it a federal right which is within the jurisdictional purview or § 1331(a)?

It seems clear from the *Tennessee Copper Co.* case, supra, that the Court regarded a State's joinder in the Union and its commitment to the Constitution as having inherently insured or guaranteed to it a right of protection by a federal court against improper pollution or impairment by outside sources of its appropriate environment and resource conditions. The opinion, written by Mr. Justice Holmes, said (206 U.S. at 237, 27 S.Ct. at 619):

> "The caution with which demands of this sort, on the part of a state, for relief from injuries analogous to torts, must be examined, is dwelt upon in Missouri v. Illinois, 200 U.S. 496, 520, 521, 26 Sup.Ct.Rep. 268, 50 L.Ed. 572, 578, 579. But it is plain that some such demands must be recognized, if the grounds alleged are proved. When the States by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests; and the alternative to force is a suit in this court. Missouri v. Illinois, 180 U.S. 208, 241, 45 L.Ed. 497, 512, 21 Sup.Ct.Rep. 331".

The source or basis itself for such a quasi-sovereign ecological right, in a State's position as part of the general political Union, was not discussed, but the right apparently was regarded as having existence in the common law and as being entitled to remedy within common law principles. The opinion spoke of such an injury as one "analogous to torts" and of the right to relief therefor in terms of "abatement of outside nuisances". While the case thus cannot be said to have recognized the right as in itself having a federal source, the Court's holding that a State is entitled to federal judicial protection of it from violation by outside sources would at least cause it to have a status of direct protectability and justiciability in relation to the Constitution.

But if this would not be sufficient technically to entitle it to be regarded as a matter arising under the Constitution or laws of the United States within the jurisdictional grant of § 1331(a), we think the legal concepts and developments which have occurred since the time of the *Tennessee Copper* decision would presently call for it to be viewed as one which is within the purview of the statute as being a right entitled to have existence under federal common law. At the time of *Tennessee Copper Co.*, the need for and existence of federal common law had not yet been recognized, and it was only natural that the court should then deal with the question before it upon the indefinite basis that it did.

As the field of federal common law has been given necessary expansion into matters of federal concern and relationship (where no applicable federal statute exists, as there does not here), the ecological rights of a State in the improper impairment of them from sources outside the State's own territory, now would and should, we think, be held to be a matter having basis and standard in federal common law and so directly constituting a question arising under the laws of the United States. We agree with Professor Charles Alan Wright that " * * * it should be held that 'federal common law', when it exists, is among the 'laws of the United States' referred to in the jurisdictional statute, and that except in the admiralty field [see Romero v. International Terminal Operating Co., 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)] there is federal question jurisdiction based on federal common law". Wright, Law of Federal Courts, 2d Ed. (1970), § 17, p. 59.

As mentioned earlier, the term "arising under", etc., has not had an absolute signification or unvarying scope in its use, either generally or in relation to § 1331(a). Historical, judicial and other conceptual factors have been permitted to enter into the consideration of some federal right claims and to be accorded limitational effect on the question of jurisdictional intent in respect to them. It is not possible to crystalize these conceptual limitations on the application of the statute into any definitive rule.

Thus, the most that the American Law Institute's Study of the Division of Jurisdiction between State and Federal Courts apparently felt could be characterizingly stated on this aspect was: " \* \* \* [T]he general grant of federal question jurisdiction, 28 U.S.C. § 1331(a), which in this respect is unchanged from the Act of 1875 first providing for such jurisdiction, is in language substantially the same as the language in the Constitution creating this branch of judicial power. Yet the construction of the statute should be, and is, narrower than the construction given the constitutional language". Tentative Draft No. 6 (1968), Commentary § 1311, p. 81.

Similarly, Mr. Justice Frankfurter, in Romero v. International Terminal Operating Co., 358 U.S. 354, 379, 79 S.Ct. 468, 484, with his characteristic proclivity for attempting formulation, came forth with this abstract summarization:

"The Act of 1875 is broadly phrased, but it has been continuously construed and limited in the light of the history that produced it, the demands or reason and coherence, and the dictates of sound judicial policy which have emerged from the Act's function as a provision in the mosaic of federal judiciary legislation".

All of this, however, is capable of being regarded as falling within the scope of the Court's initial declaration in Ames v. Kansas, supra, 111 U.S. at 471–472, 4 S.Ct. at 448:

"The judicial power of the United States extends to *all* cases arising under the constitution and laws, and the act of 1875 commits the exercise of that power to the circuit [now District] courts. It rests, therefore, on those who would withdraw any case within that power from the cognizance of the circuit courts to sustain their exception 'on the spirit and true meaning of the' act, 'which spirit and true meaning must be so apparent as to overrule the words its framers have employed' ".

At all events, we have not found anything in the cases of limitative construction which have occurred, nor are we able to see anything in the nature of the ecological situation involved, as a matter of federal right claim, that seems to us to require the conclusion that Texas is precluded, for lack of jurisdiction under § 1331(a), from choosing to resort to the Federal district court to have its controversy determined. [It may be added parenthetically that no question is raised or is apparent as to the jurisdictional amount not being involved.]

Federal common law and not the varying common law of the individual States is, we think, entitled and necessary to be recognized as a basis for dealing in uniform standard with the environmental rights of a State against improper impairment by sources outside its domain. The more would this seem to be imperative in the present era of growing concern on the part of a State about its ecological conditions and impairments of them. In the outside sources of such impairment, more conflicting disputes, increasing assertions and proliferating contentions would seem to be inevitable. Until the field has been made the subject of comprehensive legislation or authorized administrative standards, only a federal common law basis can provide an adequate means for dealing with such claims as alleged federal rights. And the logic and practicality of regarding such claims as being entitled to be asserted within the federal-question jurisdiction

of § 1331(a) would seem to be self-evident.

On what has been said, we hold that the State of Texas was not precluded on its character as a party from bringing a federal-rights suit in the district court under § 1331(a); that the ecological controversy involved is one which is entitled to the application of federal common law as a basis for the existence and determination of the rights in the situation; that the rights asserted and the nature of the controversy are such as properly to entitle the matter to be regarded as one arising under the laws of the United States within the jurisdictional language of § 1331(a); that no historical, judicial, or other compelling conceptual factor has been urged upon us, or of which we are aware, such as to require the exclusion of the situation from the application of the statute; and that the District Court must accordingly be held to have erred in its dismissal.

Another State would perhaps desire, or other circumstances might perhaps prompt a State to seek, to get the Supreme Court to exercise its original jurisdiction in a controversy of this nature —and probably it would succeed, as we have suggested. But the consideration which the Supreme Court may thus have accorded the dignity of a State in the past does not persuade us that the Court has thereby meant to imply, or that it would hold, that no jurisdiction exists under § 1331(a) for a State to resort to the district courts for the determination and vindication of a federal right of this nature, if it chooses to take that course.

Appellees have alternatively suggested that we should treat the appeal as having become moot, since both the District Court and this Court had refused to issue a temporary injunction against the spraying which was being immediately threatened at the time the suit was instituted, and since that spraying has now been done. But as we read the object and prayer of the complaint, Texas sought an injunction not merely against the immediately threatened spraying, but as well against further spraying or use of Toxaphene by the defendants, individually and as a class, in the State of New Mexico "in such a manner as to endanger the water of the Canadian River watershed in Texas". Such is at least sufficiently its reasonable implication.

Reversed and remanded.